**United States District Court**
**Northern District of Alabama**
**Western Division**

| | |
|---|---|
| **Chris Sharpe,** ] | |
| ] | |
| Plaintiff(s), ] | |
| ] | |
| vs. ] | CV-97-N-0183-W |
| ] | |
| **Tuscaloosa County and Sheriff Ted** ] | **ENTERED** |
| **Sexton, individually,** ] | MAY 5 1998 |
| ] | |
| Defendant(s). | |

FILED
98 MAY -5 PH 2:5[?]
U.S. DISTRICT COURT
N.D. OF ALABAMA

### Memorandum of Opinion

After due consideration of the evidence adduced at the bench trial of this action, the court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. The plaintiff, Chris Sharpe ("Sharpe"), was arrested on July 19, 1996, and placed in the Tuscaloosa County jail on charges of felony possession of a controlled substance and felony D.U.I. He was a pre-trial detainee at the time of the incident alleged in the Complaint. (Defendant's Exhibit 3, p. 19, 22, 23).

2. On July 22, 1996, Sharpe requested medical attention for shoulder pain and anxiety attacks. He complained the anxiety attacks were giving him chest pains and that he felt like he was dying. (Defendant's Exhibit 4, p. 1). On July 26, 1996, he was referred to and seen by medical personnel from the Indian Rivers Mental Health Center who visited him at the jail. The physician's diagnosis was that Mr. Sharpe was having panic attacks. (Defendant's Exhibit 4, p. 3) He was given Ibupropen for his shoulder pain and continued on his previously prescribed medication of Paxel and Luvox. Sharpe signed a non-suicide



contract on August 7, 1996, with Indian Rivers when he was again visited by personnel from that facility.

3. On August 26, 1996, Sharpe's wife called and reported that her husband was having suicidal thoughts. Sharpe was then interviewed by the nurse on duty at the jail, and he told her that he had been thinking about killing himself. Based upon these facts and pursuant to policy, Sharpe was placed in a restraint chair in a holding cell for his own protection, and suicide prevention precautions were placed into effect.

4. There was, at the time of these events, a written suicide prevention policy which had been approved by defendant Sexton. This policy was written on August 23, 1993, and revised on January 12, 1996.

5. According to the policy, any inmate already in jail who says he is going to commit suicide will be declared a suicide risk and will be: (1) strip searched to assure no type of weapon is being concealed; (2) have all clothing items removed—the purpose of this requirement being to prevent the inmate from using the clothing as a tool to commit suicide, as was testified to by both Sheriff Sexton and Chief Taggart; (3) be placed in his briefs; (4) be placed in a four (4) point restraint while lying on their back for a minimum of 72 hours, but this policy was changed when the restraint chair was purchased, according to both Sheriff Sexton and Chief Taggart, in order to provide a more humane and secure means for restraining the inmate; further, in practice, the minimum of 72 hours was limited to the amount of time which passed between the inmates being placed in the restraint chair and his being evaluated by mental health professionals from Indian Rivers Mental Health Center; following evaluation, those professionals would determine further conditions of

confinement for the inmate; (5) after the inmate is restrained, a check would be made every 15 minutes by the detention officer working the assigned floor; and (6) at the end of every eight (8) hour shift, the nurse, when practical, should come in and examine the inmate. The policy provided that inmates were to be referred to mental health professionals as soon as possible after the suicide prevention policy was initiated.

6. The written policy required that, at the end of the 72 hour period, the inmate be placed on a suicide watch; however, both Sheriff Sexton and Chief Taggart testified that they could not recall anyone being placed on suicide prevention who waited a full 72 hours until they were first seen by a mental health professional from Indian Rivers Mental Health Center and, further, that upon being seen by such professional, the professional would dictate the conditions of confinement from that point forward.

7. Although the written suicide policy called for a four (4) point restraint, that practice had been changed upon the facility's purchase of the restraint chair, which was deemed to be a more humane and secure manner in which to restrain both violent and suicidal inmates. While there was no written policy regarding the use of the restraint chair at the time of the incident complained of, a written policy was adopted on February 5, 1997, which formalized the procedure previously used regarding the restraint chair. The written policy, as well as the prior policy, required all inmates who are deemed to be suicide risks to be placed in the restraint chair under the terms of the suicide prevention policy and, further, required those inmates who presented extreme disciplinary problems and a threat to the security of the facility to be placed in the restraint chair in order to prevent them from harming either themselves, detention officers or others.

8.  It was the policy of the Tuscaloosa County jail to use the restraint chair for suicide prevention and to restrain inmates who were a threat to the security of the facility, themselves, detention officers, or others. There was no difference in the manner in which inmates were restrained in the chair whether for disciplinary reasons or pursuant to the suicide prevention policy.

9.  On August 26, 1996, at 6:45 p.m., Sharpe was placed in a holding cell, by himself, in the restraint chair upon authority of Detention Officer Supervisor L. H. Hurst in accord with the suicide prevention policy. Jail records indicate that Sharpe was periodically checked from the time he was placed in the restraint chair until he was released from the chair at the direction of mental health professionals from Indian Rivers Mental Health Center at 5:15 p.m. on August 28.[1] Sharpe alleges he was denied access to bathroom facilities for the 46 ½ hours he was confined to the restraint chair, and the jail record does not indicate he was allowed out of the chair for that purpose. However, Sharpe admits being offered his meals and eating some of them during this same period though this is also not recorded. The court does not credit the plaintiff's testimony that he was denied the used of a restroom during the time he was held in the restraint chair. Sharpe alleges he was placed in the restraint chair in his jail uniform with no underclothes, which is directly contradictory to the jail policy of having the uniform removed and being left in his briefs. The purpose of

---

[1] Sharpe testified that he could tell he had been in the restraint chair for a period of three days because he was able to keep up with the time by watching the sun through a window and inmate Maxwell testified that he could see the sun through a vent in the ceiling of the holding cell; however, both Sheriff Sexton and Chief Taggart testified that, not only was there no window in the holding cell, nor any other means to see the outside world from inside the cell, there was no window or other means for observing the outside world anywhere within the jail in close proximity to the holding cell. The court does not credit the testimony of Mr. Sharpe in this regard.

removing the uniform is specifically to prevent an inmate believed to be a suicide risk from using any portion of the uniform to assist in a suicide effort.

10. The holding cell log indicates that between approximately 7:30 p.m. on August 26 and the approximately 5:15 p.m. on August 28, 1996, Sharpe sat quietly in the restraint chair except for a brief period at approximately 9:00 p.m. on August 26 when he pushed the restraint chair about the holding cell. Mr. Sharpe at some time on the evening of the 26th told a jail officer that he did not intend to harm himself.

11. Mr. Sharpe was visited by medical personnel from the Indian Rivers Mental Health Center at approximately 5:15 p.m. on Wednesday, August 28, 1996. After this visit he was released from the restraint chair and placed on a seven day suicide watch in an isolation cell, where he signed another contract by which he made another commitment that he would not harm himself. He was returned to the jail's general population on September 4, 1996.

12. Sharpe, at the time of his commitment to jail, was taking the prescription medications Paxil and Luvox. (Defendant's Exhibit 4, p. 28-29). He completed his course of these medications on August 5, 1996, as to the Paxil, and August 8, 1996, as to the Luvox. (Defendant's Exhibit 4, p. 28-29). No further medications were either ordered by any physician or requested by Sharpe prior to his being placed in the restraint chair.

13. Sharpe was released from custody on November 23, 1996, (Defendant's Exhibit 3, p. 62) was arrested again on Monday, December 30, 1996, and was committed to jail at approximately 11:27 p.m. on charges of failing to appear and driving with a revoked license. At the time he was committed to jail, he appeared to be under the influence of

alcohol or drugs, and his behavior suggested both a risk of assault to staff or other inmates and a risk of suicide. (Defendant's Exhibit 3, p. 65). He was crying and initially stated that he wanted to die, later changing that to make the more clear threat that he wanted to kill himself. (Defendant's Exhibit 3, p. 73). Shortly after being arrested on this occasion, Mr. Sharpe was against placed in the restraint chair where he remained until at least 4:00 a.m. on Wednesday, January 1, 1997. Sharpe was released from the chair later on that date. (Defendant's Exhibit 3, p. 77).

14. Pre-trial detainees Maxwell, Jackson and Tubbs gave testimony through deposition about being in the chair for disciplinary reasons as follows:

(a) Jackson testified he was put in the chair naked for a period of either 1, 2 or 4 days depending on which part of his deposition one is reading. He testified that, during the entire time he was in the chair, he never had a need to use the restroom. Though he admits to being fed, he denies being allowed any water. He was apparently not too terribly uncomfortable as he testified that all he did the entire time he was in the chair was sleep. Jackson was placed in the chair for fighting. He was in jail after having been convicted of capital murder and was awaiting sentencing.

(b) Tubbs testified that he was put in the chair naked for a period of one day and that the chair was dirty when he was placed in it. He initially said that he was let out of the chair to use the bathroom but later denied being allowed bathroom breaks and instead testified that he used the bathroom on himself. He denied being seen by medical persons and denied being allowed water breaks, though he admitted he was given kool-aid. He was fed three times during his alleged 24 hour stay. He was put in the chair for fighting.

(c) Maxwell testified that he was placed in the chair naked for some period of time, which he once stated was two days; however, he also stated he was not sure how long he had been in there as he had lost track of time. He once testified that he felt he was in there two days because he could see the sun through the vent in the ceiling of the holding cell. He admitted being given bathroom breaks and water. He testified that persons who had been in the chair before him had told him that it made their knees sore.

Neither Jackson, Tubbs nor Maxwell testified that the guards threatened them with the chair or that "everyone knew about the chair." Tubbs testified that he had been told by the guards, "If you cut up we've got something for you," but they did not name the chair specifically, and Maxwell testified that he had been told that the chair made your knees sore. Other than these statements, there is nothing that would tend to indicate that the inmates were either threatened with the chair or that all inmates knew about the chair.

15. The jail's inmate discipline policy, states that "jail personnel will not violate an inmate's right to be free of cruel and unusual punishment. Cruel and unusual punishment includes punishment such as: . . . deprivation of hygienic necessitates, adequate sanitation, access to counsel, lack of care that may injure of impair the health of the inmate, infliction of mental distress, degradation or humiliation."

16. It is unclear whether the restraint chair was used as a means of punishment. It certainly was used to restrain inmates who were believed to present a danger to themselves, to others, or to jail security. The court does not credit the deposition testimony inmate Maxwell who stated, "That's the chair that they had in the hole for punishment they give you for something." (Maxwell depo. p. 6.)

17.     The suicide prevention policy called for the at risk inmate to be placed in the restraint chair for a period of 72 hours or until a mental health professional arrived to consult with the inmate, at which time the conditions of confinement would be as was indicated to be appropriate by the mental health professional.

18.     Over a period of years, various methods of restraint have been used at the jail in an attempt to restrain inmates who were deemed to be suicide risks. Prior to the use of the restraint chair, there were several suicide attempts annually and at least one suicide within the past six years. Many of those attempts were made by inmates who were on a so called "suicide watch," including those who were on the "buddy system." Since implementation of the current policy and use of the restraint chair began, suicide attempts have been reduced dramatically, and no suicide attempts have been made by anyone on "suicide watch."

19.     Typically, as soon as possible after an inmate is placed under the suicide prevention policy, detention officers contact Indian Rivers Mental Health Center and request an evaluation of that inmate. Such evaluations are generally performed within 24 hours, almost always performed within 48 hours and have not, to the knowledge of either Sheriff Sexton or Chief Taggart, ever been delayed for so long as 72 hours. Once the request is made to Indian Rivers, the timing of the response is determined by the availability of health care professionals on their staff.

20.     The restraint chair is constructed of molded plastic. As used with regard to Mr. Sharpe, it had a padded cushion in the lower back area for support, and restrained the inmates' legs as though in a seated position and the inmates' arms to the sides of his thighs.

**Discussion**

Defendant Tuscaloosa County, Alabama, is entitled to judgment as a matter of law in its favor because, for the purposes of imposing civil rights liability for injuries sustained in a county jail, Alabama sheriffs act as state officers and not as officers of the counties they serve. Each county government is liable only for acts that it commits. *Turquitt v. Jefferson County, Alabama*, 137 F.3d 1285 (11th Cir. 1998) (en banc) (overruling *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989) to the extent that it conflicts with this decision). Although counties fund the operations of the jail, provide facilities to house the jail and are statutorily charged with remaining informed about conditions within the jail, the sheriff operates the jail under a duty placed upon him by state law. *Id.* at 1289.

In this case, Sharpe alleges the, "County and Sheriff are jointly and severally liable for Sharpe's Constitutional derivation (sic) . . . ." *Complaint* at Count I, ¶ 9. Sharpe also alleges that "defendant officers, individually, and Tuscaloosa County are liable for outrageous conduct." *Id.* at Count II, ¶ 2. However, the facts of this case do not support any direct involvement of the county or its decision-makers in the alleged offenses. Accordingly, Tuscaloosa County, Alabama, is not liable to Sharpe in this action.

Individual defendant Ted Sexton ("Sexton"), Sheriff of Tuscaloosa County, Alabama, is not liable to Sharpe in this action either. Under the facts of this case, Sexton is entitled to qualified immunity from liability for the alleged violations brought pursuant to 42 U.S.C. § 1983 ("§ 1983"). The doctrine of qualified immunity represents a balance between the need for a damages remedy to protect the rights of citizens and the need of government officials to be able to carry out their discretionary functions without the fear of constant

baseless litigation. *GJR Investments, Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1366 (11th Cir. 1998). The doctrine embodies an "objective reasonableness" standard, giving a government agent the benefit of the doubt unless his actions were so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed them. *Id.* Qualified immunity thus represents the rule, rather than the exception. *Id.* "Because qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity." *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir.1994).

With respect to § 1983, government officials performing discretionary functions are immune not just from liability, but from suit, unless the conduct which is the basis for suit violates "clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. For a right to be "clearly established," previous case law must have developed it in a concrete factual context so as to make it obvious to a reasonable government actor that his actions violate federal law. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

In this case, Sexton acted within the scope of his discretionary function as county sheriff in setting policy or custom for the jail, supervising operation of the jail and training employees of the jail. *See McCoy v. Webster*, 47 F.3d 404, 407 (11th Cir. 1995); *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992). Furthermore, Sharpe has cited no cases, decided prior to the time of the alleged violations in this case, establishing that Sexton's actions in this case violate "clearly established" law. Sharpe cites cases,

factually dissimilar to the case at bar, purported to prohibit "imposing on a pretrial detainee conditions of detention that amount to punishment." *See e.g. McMillian v. Johnson*, 88 F.3d 1554 (11th Cir. 1996) (holding that placing a pretrial detainee on death row constituted punishment); *Hamm v. DeKalb County*, 774 F.2d 1567 (11th Cir. 1985) (holding that pretrial detainees must be provided such basics as food, living space and medical care). However, in this case, Sharpe did not prove that the restraint chair was used to punish him, rather the overwhelming evidence supports this court's conclusion that the chair was used to protect him in response to his threat of suicide. The plaintiff has directed the court's attention to no authority which holds that a county sheriff may not restrain a pretrial detainee who has threatened to harm himself until professional psychiatric help can be obtained. This is particularly so where the inmate is restrained in a reasonably comfortable manner, as was the case with Sharpe. Therefore, Sexton is entitled to qualified immunity from liability for the claims brought pursuant to § 1983.

Sharpe also alleges a state law claim of outrage against Sexton in his individual capacity. *Complaint* at Count II, ¶ 2. The general rule in Alabama is that "officials acting within the general scope of their authority have a qualified or discretionary immunity and are not subject to tort liability for an administrative act or omission." *Taylor v. Shoemaker*, 605 So.2d 828 (Ala.1992). This discretionary immunity applies to "those acts to which there is no hard and fast rule as to the course of conduct that one must take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstance." *Wright v. Wynn*, 682 So. 2d 1, 4 (Ala. 1996). The Alabama Supreme Court adopted the Restatement (Second) of Torts definition of qualified immunity, which provides

that "[a] public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if . . . he engaged in the exercise of a discretionary function." *Id.* (quoting Restatement (Second) of Torts § 895D (1979)). Thus, just like under § 1983, government officials are immune from tort actions unless they violate "clearly established law." *Ex parte City of Birmingham*, 624 So.2d 1018, 1021 (Ala.1993). ("Plaintiffs must do more than allege their opinion that the municipal officials acted incorrectly.")

In Alabama, the tort of outrage was first defined by the Alabama Supreme Court in *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1980). The court stated, "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress." *Id.* at 365. The court emphasized that the tort was reserved for "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.*

Sharpe cites no legal authority for the proposition that Sexton's alleged acts in this case "clearly" fell within the ambit of Alabama's tort of outrage. Moreover, none of the conduct complained of in this action satisfies the stringent standard necessary to establish a claim for outrage. Therefore, Sexton cannot be held individually liable on Sharpe's state law claim of outrage.

## Conclusion

Accordingly, in an order of final judgment, to be entered contemporaneously with this memorandum of opinion, the court will enter judgment for the defendants and dismiss all claims against them with prejudice.

Done, this 5th day of November, 1997.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE